FILED IN CLERK'S OFFICE

SEP 22 2008

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| NORTEL NETWORKS INC., a Delaware Corporation and NORTEL NETWORKS LIMITED, a Canadian Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>PEACOCK COMMUNICATIONS, ATSSC, INC., individually and d/b/a ATLANTA TELEPHONE COMPANY, JOHN PEACOCK, individually and d/b/a/ ATLANTA TELEPHONE COMPANY,<br><br>Defendants. | Civil Action No.<br>FILED UNDER SEAL<br><br>1 08-CV-2969<br><br>-ODE |

# COMPLAINT

Plaintiffs Nortel Networks Limited and Nortel Networks Inc. (collectively referred to herein as "Nortel" or "Plaintiffs") by way of this Complaint allege as follows:

## I. INTRODUCTION

Atlanta Telephone is at it again. After this former authorized Nortel reseller was caught violating a myriad of contractual obligations, its contract was terminated and Nortel sued the company to recover the damages it had inflicted on

Nortel. Discovery revealed a vast volume and breadth of wrongdoing. Cognizant that there were no facts, defenses, or arguments that could exonerate the company, Atlanta Telephone conceded defeat and resolved the matter by way of a consent judgment in the amount of **$10 million**.

The expectation, of course, was that Atlanta Telephone's ensuing conduct would strictly adhere to the law. After enduring the costs of protracted litigation, the belief was that the company (and its president) would obey and respect Nortel's intellectual property rights.

Unfortunately, no amount of coercion will curb Defendants' defiance. Just recently, a third party reported to Nortel that Atlanta Telephone company is selling *counterfeit* Nortel telephones, which Atlanta Telephone's president is falsely representing as "new." Nortel independently investigated the third party report, inspected the telephones, and confirmed that Atlanta Telephone is indeed selling non-genuine telephones using Nortel's trademarks—*i.e.,* counterfeiting. Nortel's investigation also revealed that Atlanta Telephone has at least 5,700 of these counterfeit telephones.

## II.   JURISDICTION AND VENUE

1. This is an action for infringement of trademark pursuant to 15 U.S.C. §§ 1114 and 1116 based on Defendants' sale of counterfeit goods, and pursuant to 15 U.S.C. § 1125 for false designation of origin and dilution under the Lanham Act.

2. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1138.

3. Venue is proper in this district under 28 U.S.C. §§ 1391(b).

1986298_2.DOC

### III.  PARTIES

4. Plaintiff, Nortel Networks Limited ("NNL"), is a company organized and existing under the laws of Canada.

5. Plaintiff, Nortel Networks Inc. ("NNI"), is a company organized and existing under the laws of Delaware with its principal place of business located at 2221 Lakeside Boulevard, Richardson, Texas.

6. NNI is the United States subsidiary of NNL. (NNL and NNI are hereinafter collectively referred to as "Nortel").

7. Defendant, Peacock Communications, ATSSC, Inc., individually and d/b/a Atlanta Telephone Company ("Atlanta Telephone" or "Defendant") is a Georgia Corporation with its principal place of business located at 3435 Breckinridge Boulevard, Suite 120, Duluth, Georgia 30096.

8. Defendant, John Peacock, individually and d/b/a/ Atlanta Telephone Company ("Peacock"), is the president and owner of Atlanta Telephone.

9. Atlanta Telephone and Peacock are referred to collectively as "Defendants", or simply as "Atlanta Telephone."

### IV.  FACTUAL BACKGROUND

**A.  Nortel Is An Industry Leader In The Field Of Global Telecommunications.**

10. Nortel was founded in 1895 as Northern Electric and Manufacturing ("Northern"). Northern celebrated its first 100 years with the introduction of the "Nortel" brand, which reflected the company's evolution from telephony to multi-service Internet and Internet Protocol ("IP") based global communication solutions. Since the invention of the telephone, Nortel has been a constant

1986298_2.DOC

innovator and pioneer in the business of communications. Today, Nortel is an industry leader and innovator in the field of global telecommunications and conducts business in more than 150 countries.

11. One of Nortel's signature products are its telephone sets. As technology has evolved towards a digital communications platform, Nortel has not only kept up but set the pace of innovation. Specifically, Nortel's M3900 Series Meridian Digital Telephones ("M3900s") bring the functionality and familiarity of Nortel's previous analog models while providing end users with the convenience and advantages of a digital product. These telephone sets can seamlessly interface to the desktop with display-based interfaces, call log, self-labeling keys, and simplified administration. The M3900s come in five models and a variety of accessories to meet diverse requirements for features, ease of use, and productivity.

12. A genuine M3900 telephone can be identified by a number of indicators. For example, in 2005, Nortel introduced a holographic label to be placed on the telephones to identify "Authentic Nortel product" in order to facilitate distinguishing Nortel product from other products. The holographic label was chosen as it would be extremely difficult to counterfeit. Further, Nortel places bar code labels on the back cover of the telephone sets.

### B. Nortel Is The Owner Of Its World Famous Marks.

13. On September 17, 1996, the Nortel mark was registered on the Principal Register of the United States Patent & Trademark Office as Registration No. 74233687. Subsequent thereto, Nortel registered the Nortel mark and a variety of other marks, including the Nortel mark with the astrolabe design and the Nortel

4

Networks mark, on telecommunications equipment (including telephones, telephone switches, cellular mobile equipment, wireless communications products, fiber optic cable, transmission equipment), computer software, and telecommunication service (including engineering services in the field of telecommunications such as installation, maintenance, repair services, distributorship services and operational services). Nortel's right to use in commerce the Nortel and Nortel Networks marks has become incontestable pursuant to 15 U.S.C. § 1065.

The Nortel mark with the astrolabe design is as follows:



The Nortel Networks mark is as follows:



14. The registrations of these and other Nortel marks are valid, subsisting, and exclusively owned by Nortel. Nortel's marks have been continually used by Nortel throughout the world and in the United States, including Georgia, on or in connection with the manufacture, distribution, sale, promotion, and servicing of its products, which includes telephones such as the M3900s.

1986298_2.DOC

15. As a result of Nortel's widespread and continuous use, advertisement, promotion, and service of its products in connection with its marks, they have become widely known and recognized as identifying Nortel as the source of products and services distinguishable from other products and services.

16. Nortel's marks have come to represent and symbolize the excellent reputation of Nortel's products, services, and valuable goodwill among members of the public throughout the world and in the United States, including Georgia. Nortel's marks have acquired a secondary meaning throughout the world and in the United States, including Georgia.

17. In order to maintain the high quality of Nortel's products, services, and customer satisfaction, Nortel sells its products through authorized Nortel distributors.

18. Nortel requires that its authorized distributors adhere to stringent procedures in order to maintain the high quality standards of Nortel's products. For example, authorized distributors are contractually required to: (1) employ a competent and aggressive sales and technical support organization; (2) establish, staff, and maintain service centers, in sufficient numbers, to support the installation, warranty, and post warranty maintenance requirements for the products; (3) provide installation and repair activity using materials that meet Nortel's minimum quality specifications as published in relevant support documentation; (4) provide sufficient initial and periodic supplemental training to its engineering and other technical support staff; (5) provide appropriate facilities, tools and equipment; (6) perform and comply with all discount or promotional programs; (7) meet all eligibility standards that Nortel may require for a designated product; (8) comply with all applicable industry standards for sales and support of

the Nortel products sold; (9) install and maintain the products in a manner which will neither damage the quality or functionality of the products nor require extraordinary technical support; (10) be responsible for addressing all warranty issues with its customers; (11) offer a warranty to all end users where applicable; (12) be responsible for customer satisfaction; (13) be responsible for sending employees or subcontractor employees to required training and, if applicable, paying for such training; and (14) purchase all hardware and software requirements from Nortel.

19. The foregoing requirements employed by Nortel are an integral part of Nortel's ability to maintain the quality of its products and the valuable goodwill of its marks.

### C. Defendants Are Caught Selling Counterfeit Telephones.

20. On or about June 24, 2008, a company called Sotel Systems LLC ("Sotel") that buys and sells Nortel products on the secondary market agreed to purchase 3,700 M3900s from Vincent Solon ("Solon"). Specifically, the order was for the following: (1) 600 M3902s; (2) 1200 M3903s; (3) 1400 M3904s; and (4) 500 M3905s. Most significantly, the telephone sets were advertised as being "new" products.

21. On or about July 25, 2008 a partial shipment of the telephone sets was delivered to Sotel. The shipping documents indicated that the telephone sets had been sold to Solon by Defendants. Sotel was immediately concerned because it had stopped doing business with Defendants approximately one year ago because it perceived Defendants as operating an unethical and untrustworthy business.

1986298_2.DOC

22. When Sotel made an inspection of the telephone sets, it immediately recognized that they were not genuine Nortel telephone sets. Sotel recognized a variety of differences between genuine Nortel telephone sets and the telephone sets provided by Atlanta Telephone – *e.g.*, the boxes were different than the new telephone boxes; the labels were different; the part number was different (and discontinued); and the Nortel hologram was missing. Further, the shipping documents indicated that the telephones were originally sold by Atlanta Telephone.

23. Sotel advised Solon that the telephones he sold were not genuine Nortel telephone sets. Solon contacted Defendants about this fact and Defendants insisted that the telephone sets were genuine. Specifically, Peacock wrote the following in a July 30th email: "First thing the telephones are new; according to the manufacturer, they're not remans [i.e., remanufactured telephones]. I just opened up 2 or 3 myself a few minutes ago, and they're definitely not remans. They're new as new can be." (Emphasis added).

24. Bewildered over Defendants' refusal to acknowledge that they were selling counterfeit Nortel products, Sotel contacted Peacock directly to convey (1) its disappointment and disbelief with Defendants' refusal to acknowledge their misrepresentations about selling new Nortel telephone sets; and (2) demand that Defendants never contact Sotel again. Sotel advised Peacock that Atlanta Telephone was a "blacklist vendor" with which Sotel will never again do business.

25. Defendants' response revealed the lengths they will go to perpetuate fraud. In a feeble attempt to gain credibility with Sotel, Peacock wrote, "I have been in the factory where they make them [the telephone sets] and I have close

friends that are associated with that factory, and I have done millions of dollars with them."

26. The problem with Peacock's representation is that Nortel manufactures its telephone sets in Guadalajara, Mexico and in China. When pressed to identify the location of this "factory," Peacock told Sotel that it was in Tennessee; however, Nortel does not manufacture any telephone sets in the United States, let alone Tennessee.

### D. Nortel Confirms That Defendants Sold Counterfeit Telephone Sets.

27. Because Defendants refused to acknowledge their wrongdoing, Sotel contacted Nortel to report Defendants' counterfeit sales.

28. Nortel requested that Sotel provide it with a sampling of the telephone sets that came from Atlanta Telephone.

29. Nortel received a sampling of the telephones and confirmed that the telephone sets were indeed counterfeit. To illustrate, the following differences could be found between genuine Nortel telephone sets and the telephone sets provided by Defendants:

> A. The box is dated 2007/09/08, and states that the telephones were manufactured in "Montery." Although Nortel previously manufactured telephones in Monterrey prior to 2002, it has not done so in over five years. Thus, the misspelling of Monterrey and the fraudulent dates are obvious signs of counterfeiting.

9

B. The telephones lack the holographic label which identifies authentic Nortel telephones.

C. The bar code labels on the back cover of the telephone sets are oversized and accompanied by two additional small labels. This is not standard to Nortel practice.

D. Internal to the set, the foam covering the speaker was of a different density and had a clear acoustic septum rather than the white one from the comparison product of the same period.

## FIRST COUNT
### (Trademark Infringement, 15 U.S.C. §§ 1114 & 1116)

30. Nortel re-alleges each and every allegation set forth in Paragraphs 1 through 29, inclusive, and incorporates them by this reference herein.

31. Nortel has long used several trademarks including, but not limited to, the Nortel mark with the astrolabe design and the Nortel Networks mark. Nortel is the owner of these world famous marks.

32. Nortel sells "new" products through its authorized distributors and authorized channels.

33. As discussed above, Nortel's marks have come to represent and symbolize the excellent reputation of Nortel's products, services, and valuable goodwill among members of the public and in the United States, including Georgia.

34. In deliberate violation of Nortel's exclusive rights in the Nortel trademarks, Defendants have offered for sale, sold and distributed in this District and perhaps elsewhere, under the Nortel trademarks, products that are materially

different from genuine Nortel products. Thus, Defendants' sales of non-genuine Nortel products constitutes counterfeiting under 15 U.S.C. § 1116.

35. Defendants have offered for sale, and sold, non-genuine Nortel products falsely representing that the products are "new."

36. Defendants' acts have caused and, unless restrained by this Court, will continue to cause Nortel and the public to suffer great and irreparable damage and injury through, *inter alia*, (1) a likelihood of confusion, mistake, and deception among the relevant purchasing public and trade, and (2) the loss of Nortel's valuable goodwill and business reputation symbolized by Nortel's marks.

37. Nortel has suffered loss of profits and other damage, and Defendants have earned illegal profits, in an amount to be proven at trial, as the result of the aforesaid acts of Defendants.

38. The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to treble damages under 15 U.S.C. § 1117(b).

## SECOND COUNT
### (Dilution of Famous Mark, 15 U.S.C. § 1125)

39. Nortel re-alleges each and every allegation set forth in Paragraphs 1 through 38, inclusive, and incorporates them by this reference herein.

40. The Nortel trademarks, as described above, are extremely strong and well-recognized. As such, these marks are considered "famous marks" within the meaning of 15 U.S.C. § 1125(c).

1986298_2.DOC

41.     Defendants' unlawful activities as described above, including Defendants' unauthorized sales of inferior non-genuine products bearing the Nortel marks has diluted the value of Nortel's famous marks.

42.     Defendants' unauthorized sale of counterfeit Nortel products has blurred and/or tarnished Nortel's famous trademarks, and has decreased the selling power of such marks.

43.     Nortel is entitled to injunctive relief, and since Defendants' conduct was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, Nortel is also entitled to recover monetary damages, treble damages, and attorneys' fees.

## THIRD COUNT
### (False Designation of Origin, 15 U.S.C. § 1125(a))

44.     Nortel re-alleges each and every allegation set forth in Paragraphs 1 through 43, inclusive, and incorporates them by this reference herein.

45.     Defendants' sales of counterfeit Nortel products by improperly using the Nortel marks constitutes use of a false designation of origin or false and misleading representation in interstate commerce that wrongfully associates and/or leads the public to believe that Nortel is connected, affiliated, of associated with Defendants, and/or that Nortel sponsors or approves the inferior non-genuine products sold by Defendants.

46.     Defendants' false designations have caused Nortel to suffer irreparable injury and damages, in an amount to be proven at trial.

1986298_2.DOC

## REQUEST FOR RELIEF

**WHEREFORE**, Nortel prays for judgment against Defendants as to all counts of this Complaint, and respectfully requests that the Court provide relief for Nortel as follows:

1. Enter a temporary restraining order and preliminary injunction requiring that Defendants immediately cease and desist from selling non-genuine Nortel products and not to disclose any information related to this lawsuit to anyone until the Court holds a preliminary hearing under 15 U.S.C. § 1116(d)(10);

2. Enter a permanent injunction prohibiting Defendants from selling non-genuine Nortel products;

3. Enter a finding that Defendants' actions were willful, deliberate, and malicious;

4. Award damages to be proven at trial that may be trebled based on Defendants' intentional wrongful conduct;

5. Enter an order, pursuant to 15 U.S.C. § 1116, allowing Nortel to seize all counterfeit Nortel products and documents related thereto, as authorized by statute and Court order;

6. Enter an order, pursuant to 15 U.S.C. § 1118 and other applicable law, directing Defendants to deliver for destruction all products in its possession or under its control that infringe Nortel's intellectual property rights;

7. Enter an award of attorneys' fees and costs in favor of Nortel; and

8. Enter an order sealing this Complaint and the related pleadings filed concurrently herewith until such time as the Court deems proper to unseal the documents.

## DEMAND FOR JURY TRIAL

Nortel hereby demands a jury trial on all causes of action.

Respectfully submitted this 22nd day of September, 2008.

                    TROUTMAN SANDERS LLP

                    Kevin A. Maxim
                    GA Bar No. 478580
                    *kevin.maxim@troutmansanders.com*
                    Merle R. Arnold
                    GA Bar No. 023503
                    *merle.arnold@troutmansanders.com*

**TROUTMAN SANDERS LLP**
5200 Bank of America Plaza
600 Peachtree Street
Atlanta, GA 30308
404-885-3000
404-885-3900 (fax)

**OF COUNSEL:**
SCOTT J. FERRELL (*Pro Hac Vice application pending*)
California Bar No. 202091
*sferrell@calljensen.com*
DAVID R. SUGDEN (*Pro Hac Vice application pending*)
California Bar No. 218465
*dsugden@calljensen.com*
SCOTT P. SHAW (*Pro Hac Vice application pending*)
California Bar No. 223592
*sshaw@calljensen.com*
**CALL, JENSEN & FERRELL**
A Professional Corporation
610 Newport Center Drive, Suite 700

14

Newport Beach, CA  92660  
Phone: (949) 717-3000  
Fax: (949) 717-3100                    Attorneys for Plaintiffs